United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 13, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-20804

IRVING ROSENZWEIG, on behalf of himself and all others similarly situated;
MILLER/HOWARD INVESTMENTS, INC.; MASOUD M. AL FAHAID; WALTER R.
WOOTEN; MASOUD FAISAL,

Plaintiffs - Appellants,

versus

AZURIX CORP., et al.,

Defendants,

AZURIX CORP.; REBECCA MARK; RODNEY FALDYN; JOSEPH SUTTON; JEFFREY
SKILLING; KENNETH LAY; RODNEY L. GRAY,

Defendants - Appellees.

MALCOLM ROSENFELD, on behalf of himself and all others similarly situated

Plaintiff - Appellant,

versus

AZURIX CORP., et al.,

Defendants,

AZURIX CORP.; REBECCA MARK; RODNEY FALDYN; JOSEPH SUTTON; JEFFREY
SKILLING; KENNETH LAY,

Defendants - Appellees.

1

RUTHY PARNES, on behalf of herself and all others similarly situated

Plaintiff - Appellant,

versus

AZURIX CORP., et al.,

Defendants,

AZURIX CORP.; REBECCA MARK; RODNEY FALDYN; JOSEPH SUTTON; JEFFREY SKILLING; KENNETH L. LAY,

Defendants - Appellees.

---

BRUCE KALISH, on behalf of himself and all others similarly situated

Plaintiff - Appellant,

versus

AZURIX CORP., et al.,

Defendants,

AZURIX CORP.; REBECCA MARK; RODNEY FALDYN; JOSEPH SUTTON; JEFFREY SKILLING; KENNETH LAY,

Defendants - Appellees.

---

Appeal from the United States District Court
for the  Southern District of Texas

---

Before SMITH, DENNIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This securities fraud class action presents the issues of whether the district court, in dismissing

2

the case with prejudice, erred by (1) denying the plaintiffs' motion for leave to amend their complaint; (2) determining that none of the plaintiffs' claims were actionable under the Securities Exchange Act of 1934; and (3) determining that the plaintiffs, as aftermarket purchasers, lacked standing to pursue their claims under the Securities Act of 1933. Although we conclude that aftermarket purchasers have standing to sue under § 11 of the Securities Act of 1933, we find that the case was properly dismissed and therefore AFFIRM.

## I. FACTS AND PROCEEDINGS

Eight representative purchasers of Azurix Corporation stock brought this class action securities fraud lawsuit against Azurix, Enron Corporation, and six former Enron and Azurix officers and directors. In June 1999, Azurix, a global water and wastewater company Enron formed in January 1998, made an initial public offering of 36.6 million shares of common stock at around $20 per share. In December 2000, Enron took Azurix private by buying all the public's shares for around $8 per share. The plaintiffs, who all purchased Azurix stock in the secondary market, allege that the defendants violated federal securities laws by making various material misrepresentations and omissions in press releases and public filings. They allege these representations perpetrated a fraud on the market by artificially inflating Azurix's stock price. The district court dismissed the lawsuit with prejudice, *see In re Azurix Corp. Securities Litigation*, 198 F.Supp.2d 862 (S.D. Tex. 2002), and denied the plaintiffs' post-dismissal motion to amend their complaint.

Azurix's business plan was to acquire and operate government-owned water and wastewater facilities that were being privatized. In October 1998, Azurix acquired England-based Wessex Water for $2.4 billion. Wessex was to provide a base of technical expertise and operating experience from which Azurix would evaluate and acquire potential water projects. Just before going public in June

3

1999, Azurix successfully bid $438.6 million to obtain a 30-year water concession[1] from the province of Buenos Aires, Argentina. The Buenos Aires concession was the company's second-largest asset, behind Wessex.

Plaintiffs allege that defendants knew Azurix's business plan was fundamentally flawed and that the Buenos Aires concession was plagued with problems, but defendants nevertheless fraudulently inflated Azurix's stock price by making optimistic, misleading representations and concealing the truth.

**1. Alleged misrepresentations in the prospectus and registration statement**

The plaintiffs claim the prospectus[2] "touted Azurix's ability to become a successful player in the global water and wastewater industry," by emphasizing the company's competitive strengths of management and financial expertise. The prospectus also "emphasized the global privatization opportunities [Azurix] purportedly intended to pursue," and stated that Azurix anticipated being able to finance its ambitious capital improvement plan from the cash flows of the privatization opportunities Azurix would obtain.[3]

Plaintiffs allege these statements were made without any basis in fact. According to a Wasserstein, Parella & Co. report, which Enron commissioned in connection with the December 2000 stock repurchase, the Buenos Aires concession "faced numerous problems *since the acquisition* including

---

[1]In this context, a "concession" is given when a government grants a private party the right to operate a water and wastewater system for a fixed term, while retaining title to the underlying assets.

[2]For all relevant purposes, the prospectus and registration statements contain identical representations.

[3] The prospectus states, "We anticipate funding capital expenditures [for the Buenos Aires concession] through operating cash flows and long-term debt and equity at the concession level."

4

incomplete customer accounts, difficulties in accounts receivable collection, water quality issues and disputes over tariffs." (emphasis added). The report states that Azurix's cost of capital was "significantly higher" than its competitors'. Plaintiffs also allege Azurix was highly-leveraged and paid almost all of its IPO proceeds directly to Enron. And, according to Azurix's third quarter 1999 SEC filing, Azurix had to finance its long-term assets with short-term debt, not cash flows. In other words, plaintiffs allege there was no basis from which to conclude Azurix could possibly succeed.

The complaint also alleges that due diligence assurances[4] in the prospectus "led the investing public to conclude that defendants performed due diligence on the Buenos Aires Concession, as well as other concessions . . . ." According to former employees (who are not identified in the complaint) Azurix had sent people to Buenos Aires before taking over the concession, and those people discovered it had been poorly operated and had serious problems with collections. Azurix "hastily bid" for the concession, anyway. Plaintiffs cast these facts as alternative allegations of either a material misrepresentation (that due diligence was performed) or a material omission (that there were problems with the Buenos Aires concession).

**2. Alleged post-IPO misrepresentations**

In an August 5, 1999 press release, Azurix CEO and chairperson Rebecca Mark stated that "[t]he second quarter was a period of significant accomplishment for Azurix" and that the Buenos Aires concession would "establish[] the company as a major participant in the Argentine water market." She also stated that the IPO would "fund the many growth opportunities that will distinguish the company as a leading player in the global water industry." Plaintiffs allege Azurix repeated these

---

[4] The prospectus states, "We carefully evaluate each project to assess its value. First, we conduct a due diligence review, identifying and quantifying the specific risks of the transaction."

5

statements in its SEC quarterly filing, Form 10-Q. These statements were false, plaintiffs allege, because, again, Azurix did not have the financial capacity to grow, much less operate at a profit.

After a 7.7% stock price decline on October 20, 1999, the Dow Jones News Service ran an article in which Azurix denied there was any corporate news to account for the dip. The story quoted an Azurix spokesperson as saying, "Our fundamentals are strong." The statement is alleged to be false because it was made just two weeks before Azurix announced, in a November 4, 1999 press release, that its earnings would fall short of estimates.

Plaintiffs allege that this November 4 press release also contained fraudulent statements, which were repeated in Azurix's 10-Q. The press release quoted Mark as saying, "The pipeline of private transactions and announced public tenders that we are pursuing remains very strong, even though the timing of certain transactions is unpredictable." The statement is false, according to plaintiffs, because, as Azurix's annual SEC filing (Form 10-K) would later reveal: "During the second half of 1999, several large privatization projects were postponed or cancelled."

The complaint alleges that Azurix's 1999 10-K "did not tell the whole story" with respect to the Buenos Aires concession because, although it mentioned some of the problems, it failed to mention that the concession had water quality problems, and that there were tariff disputes.

A February 7, 2000 press release contained three allegedly actionable statements, and Azurix repeated those statements in its 10-Q. First, it quoted Mark as saying, "In the past year we have assembled the core assets and capabilities for strong growth in our key markets." This statement is allegedly false because of the "acute problems" with the Buenos Aires concession and the 1999 project cancellations.

Second, the press release quoted Mark as saying, "We have successfully expanded our operations

6

through the ownership of assets and through the services we offer as a total solutions provider to our municipal and industrial customers." The complaint asserts this statement was "materially misleading" because Mark knew that generating revenue from municipal and industrial customers would be very difficult.

Third, Mark stated in the press release, "Our Madera Ranch Water Bank project in California is an example of our innovative resources project which has considerable potential both for the community and for the company." The complaint states that Mark knew this project was "inherently uncertain" because it was contingent on government permits, construction expenditures and local property concerns.

Finally, a May 8, 2000 press release quoted Mark as saying, "Azurix continues to make steady progress toward the company's objectives to maximize the returns on our existing businesses . . . ." The complaint alleges Mark knew that the earnings would be affected by the problems in Buenos Aires. Those problems led to, among other things, a $5.4 million charge against income for the second quarter of 2000. Again, the statements were repeated in Azurix's 10-Q.

### 3. Scienter Allegations

Plaintiffs allege that defendant s knew or recklessly disregarded the truth when they issued the above statements. The Wasserstein report was based on interviews with company management, who admitted the problems Azurix faced in 1999 and 2000. According to plaintiffs, the fact that management knew of the problems when Wasserstein prepared its report suggests that management knew of the problems when they issued the challenged statements.

Plaintiffs also allege that defendants had the opportunity to commit fraud from their positions as officers or directors. Each defendant also had motives to commit fraud such as: (1) ensuring the

7

success of a January 2000 debt offering; (2) "gain[ing] access to badly needed capital at favorable interest rates"; (3) obtaining performance-based stock options; and (4) increasing the price of their beneficially-owned shares.

Finally, plaintiffs state that three defendants—Chief Executive Officer Rebecca Mark, Chief Financial Officer Rodney Gray, and Chief Accounting Officer Rodney Faldyn—resigned on the heels of negative company announcements. The suspicious timing of their departures supports an inference of scienter, according to the complaint.

**4. Plaintiffs' claims**

(a) Securities Act of 1933

Generally speaking, the Securities Act of 1933, 42 Stat. 82., 15 U.S.C. §§ 77a-77zz, 77aa ("Securities Act"), is concerned with the initial distribution of securities. Plaintiffs allege that, through Azurix's defective registration statement and prospectus, defendants violated §§ 11, 12 and 15 of the Securities Act. Section 11 applies to registered securities and imposes civil liability on various persons when the registration statement is materially misleading or defective. *See* 15 U.S.C. § 77k. It permits a securities purchaser to recover damages against, among others, signatories to a registration statement and directors of the issuer, if the registration statement "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a).

Section 12 permits a purchaser to rescind a securities sale, whether or not the security is registered, if it is sold by means of a material misstatement. *See* 15 U.S.C. § 77*l*. The purchaser may recover against his immediate seller, if the seller offered or sold the security

by means of a prospectus or oral communication, which includes an untrue statement of a

8

material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not now, and in the exercise of reasonable care could not have known of such untruth or omission.

15 U.S.C. § 77*l*(a)(2).

Section 15 imposes joint and several liability upon defendants who control persons liable under §§ 11 and 12. 15 U.S.C. § 77*o*.

(b) Securities Exchange Act of 1934

Generally speaking, the Securities Exchange Act of 1934, 48 Stat. 881 (codified in scattered sections of 15 U.S.C.) ("Exchange Act"), deals with post-distribution securities trades. Plaintiffs allege defendants violated §§ 10(b) (and its corresponding Rule 10b-5) and 20(a) of the Exchange Act. Rule 10b-5, promulgated under § 10(b), makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. 240.10b-5. Rule 10b-5 has long been interpreted to allow civil plaintiffs to sue for damages. *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971).

Section 20(a), similar to § 15 of the Securities Act, imposes joint and several liability upon persons who "control" defendants that violate the Exchange Act. 15 U.S.C. § 78t(a).

**5. The district court's dismissal**

(a) Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

The district court concluded that optimistic statements of future success in the registration statement and prospectus were not actionable because plaintiffs failed to allege that defendants knew,

9

or reasonably should have known, the statements were false or misleading *when made* in June 1999. 298 F.Supp.2d at 881. The court also held that "[s]uch statements are not actionable because no reasonable investor would rely on obvious 'puffery.'" *Id.*

The district court held that none of the challenged post-IPO statements were actionable. All the forward-looking statements were protected by the "safe-harbor" for forward- looking statements under the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (1995) ("PSLRA"). *Id.* at 884-85. Moreover, all the challenged statements were immaterial because they were either puffery, or failed to have a positive impact on Azurix's share price. *Id.* at 885-88.

Alternatively, the district court found that plaintiffs had failed to meet the PSLRA's requirement that they plead "with particularity facts giving rise to a strong inference," 15 U.S.C. § 78u-4(b)(2), that defendants acted with an intentional state of mind, or scienter. *Id.* at 888-90. The court emphasized that plaintiffs had merely pleaded that defendants had financial motives to commit fraud, and that, as officers, they had the opportunity to do so. *Id.* at 889-90. The court concluded that allegations of motive and opportunity to act with scienter, without more, would not suffice. *Id.* The court also emphasized that the allegations of scienter were not sufficiently particularized because plaintiffs' conclusory and vague allegations failed to specify that anyone in particular knew that the defendants' statements were false and misleading when made. *Id.* at 890-91.

(b) Sections 11 and 12(a)(2) of the Securities Act of 1933

The district court found that plaintiffs failed to state a claim under § 12(a)(2) because that section only permits a buyer to recover against his immediate seller; plaintiffs purchased securities in the aftermarket, not directly from defendants. *Id.* at 892-93. Similarly, the district court determined that § 11 is only available to purchasers of shares issued and sold pursuant to the challenged registration

10

statement. *Id.* Again, since plaintiffs were purchasers in the aftermarket, the district court concluded that plaintiffs had failed to state a claim. *Id*.

(c) Control person liability

Because the controlling person liability of § 15 of the Securities Act and § 20(a) of the Exchange Act is derivative of the above claims regarding the principals' liability, the district court dismissed these claims, as well.[5]

**6. The district court's denial of plaintiffs' motion to alter or amend judgment and request for leave to amend**

After dismissal, plaintiffs moved the district court to alter or amend the judgment, and for leave to amend their complaint. The motion stated that the complaint's deficiencies could be cured if leave to amend were granted, and emphasized that "as a result of the Enron investigations being conducted by Congress and the press, additional facts have come to light on the Azurix fraud." The two-page motion did not explain what new facts would be pleaded, nor did plaintiffs attach an amended complaint to the motion.

Plaintiffs' reply brief offered more detail. They alleged (1) that Azurix was merely a vehicle for Enron to conceal its own debt; (2) that Azurix vastly overpaid for the Buenos Aires concession; and (3) that Azurix vastly overpaid for its acquisition of Wessex. The reply brief quotes various news accounts to bolster the allegation that Azurix officials must have known the company was doomed, in spite of optimistic statements to the public.

The district court denied the motion because "[p]laintiffs had ample time to seek to amend their complaint before the court ruled on defendants' motion to dismiss." The court also stated that

---

[5]The district court stayed the action against Enron because of pending bankruptcy. 198 F.Supp.2d at 894. As to the rest of the defendants, the case was dismissed with prejudice.

"plaintiffs have not acted with diligence and . . . plaintiffs have not shown what facts, if any, they could now allege to overcome the deficiencies pointed out in the court's [opinion]."

## II. DISCUSSION

### A. The district court did not abuse its discretion in denying leave to amend

The parties dispute whether the plaintiffs' motion for leave to amend falls under Federal Rule of Civil Procedure 15(a), governing the amendment of *pleadings*, or Rule 59(e), governing the amendment of *judgments*. Although review of both types of motions is nominally under the "abuse of discretion" rubric*, see S. Group, Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993), the district court's discretion is considerably less under Rule 15(a). "In the context of motions to amend pleadings, 'discretion' may be misleading, because FED. R. CIV. P. 15 (a) 'evinces a bias in favor of granting leave to amend.'" *Martin's Herend Imports v. Diamond & Gem Trading*, 195 F.3d 765, 770 (5th Cir. 1999) (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. Nov. 1981)). Rule 15(a) states that leave to amend "shall be freely given when justice so requires."

By contrast, a motion to alter or amend the judgment under Rule 59(e) "must clearly establish either a manifest error of law or fact or must present newly discovered evidence" and "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986)); *see also S. Constructors Group, Inc.*, 2 F.3d at 611 (recognizing that "[d]enial of a motion to vacate, alter, or amend a judgment so as to permit the filing of an amended pleading draws the interest in finality of judgments into tension with the federal policy of allowing liberal amendments under the rules").

In this Circuit, when a district court dismisses the complaint, but does not terminate the action

12

altogether, the plaintiff may amend under Rule 15(a) with permission of the district court. *See Whitaker v. City of Houston*, 863 F.2d 831, 835 (5th Cir. 1992). When a district court dismisses an action and enters a final judgment, however, a plaintiff may request leave to amend only by either appealing the judgment, or seeking to alter or reopen the judgment under Rule 59 or 60. *See Dussouy,* 660 F.2d at 597 n.1; *see also* 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 15.12[2] (3d ed. 2003); 6 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1489 (2d ed. 1990) ("Most courts . . . have held that once a judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60.").

In this case, the district court dismissed the action with prejudice, in an order titled, "FINAL JUDGMENT." Under the rule in this Circuit, plaintiffs' post-dismissal motion must be treated as a motion under Rule 59(e), not Rule 15(a). *See Whitaker*, 963 F.2d at 835 (stating that a dismissal with prejudice indicates that the district court intended to terminate the action, not merely dismiss the complaint). Nevertheless, this Court has held that, under these circumstances, the considerations for a Rule 59(e) motion are governed by Rule 15(a):

> Where judgment has been entered on the pleadings, a holding that the trial court should have permitted amendment necessarily implies that judgment on the pleadings was inappropriate and that therefore the motion to vacate should have been granted. Thus the disposition of the plaintiff's motion to vacate under rule 59(e) should be governed by the same considerations controlling the exercise of discretion under rule 15(a).

*Dussouy*, 660 F.2d at 597 n.1. Following *Dussouy*, we review the district court's denial of plaintiffs' 59(e) motion for abuse of discretion, in light of the limited discretion of Rule 15(a).

The Supreme Court lists five considerations in determining whether to deny leave to amend a complaint: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue

13

of the allowance of the amendment, [and] futility of the amendment . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Absent such factors, "the leave sought should, as the rules require, be 'freely given.'" *Id*. "A litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend. Merely because a claim was not presented as promptly as possible, however, does not vest the district court with authority to punish the litigant." *Carson v. Polley*, 689 F.2d 562, 584 (5th Cir. 1982).

Plaintiffs take issue with both of the district court's stated reasons for denying the motion: the plaintiffs' lack of diligence, and the futility of amending the complaint. First, plaintiffs argue that the new facts were not revealed until after the briefing on the motion to dismiss. To avoid "a second wave of briefing and further delay," plaintiffs admit, on appeal, that they made the "strategic decision," to risk dismissal, with the expectation that they would be granted leave to amend. Second, plaintiffs argue that the new facts can overcome the deficiencies of the first complaint. Specifically, plaintiffs highlight various news reports showing the fundamental problems at Azurix. These problems support the plaintiffs' theme that the company was doomed from the start. And, plaintiffs introduce a new theory, allegedly supported in news accounts, that Azurix was merely a vehicle to conceal Enron's debt.

We conclude the district court's stated reasons for denying plaintiffs' motion are sound and that the court did not abuse its discretion. Plaintiffs admit they deliberately chose to delay amending their complaint, and a "busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (1967). Plaintiffs concede they have not raised any facts which were not available previous to the district court's opinion. In this regard, plaintiffs did not exercise diligence.

14

Moreover, the motion to amend hardly presents any new information. The news accounts generally speak of Azurix's well-documented woes, but plaintiffs must allege much more than that Azurix was a failed public company. They must allege securities fraud. Significantly, plaintiffs did not attach a proposed amended complaint, leaving the district court to speculate as to how these seemingly redundant facts might amount to a legal claim.

The only new allegation plaintiffs presented was the theory that Enron used Azurix as a vehicle to conceal its debt.[6] Plaintiffs advance this theory only via conclusory statements in newspaper articles, giving no indication that they would be able to meet the rigorous pleading requirements of the PSLRA. Because the plaintiffs failed to explain these new facts with any particularity and failed to connect these facts to a legal claim, we conclude the district court did not abuse its discretion.

## B. The district court properly dismissed the claims under the Securities Exchange Act of 1934

### 1. Standard of Review

This Court reviews a district court's 12(b)(6) dismissal *de novo*. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). In determining whether plaintiffs have "stat[ed] a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), the Court must accept the facts alleged in the complaint as true and construe the allegations in the light most favorable to the plaintiff. *Nathenson*, 267 F.3d at 406.

### 2. Rule 10b-5 and the PSLRA

To state a cause of action under § 10(b) and Rule 10b-5, a plaintiff must allege a (1) misstatement

---

[6]It should be noted that this theory only surfaced in the plaintiffs' *reply* to the defendants' opposition to the motion to alter or amend. The principal motion, only two pages in substance, offered *no* new facts or theories.

15

or omission (2) of material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, and upon which (5) plaintiff justifiably relied, (6) proximately causing injury to the plaintiff. *E.g., Rubinstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994).

A misstatement or omission is material if "'there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic, Inc. v. Levinson,* 485 U.S. 224, 231 (1988) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993).

The PSLRA requires actions under Rule 10b-5 to be pleaded with particularity: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Otherwise, the PSLRA directs that the district court "shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). The PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud actions under Federal Rule of Civil Procedure 9(b).[7] *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002). To avoid dismissal under Rule 9(b) and the PSLRA, the plaintiff must:

(1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;

(2) identify the speaker;

_____

[7]Rule 9(b) states, in relevant part, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

16

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

*Id*. at 350.

The plaintiff must also plead "with particularity facts giving rise to a strong inference," 15 U.S.C. § 78u-4(b)(2), that defendants acted with "scienter", which is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Scienter also includes "severe recklessness", which this Court has defined as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson*, 267 F.3d at 408 (quoting *Broad v. Rockwell,* 642 F.2d 929, 961 (5th Cir. Apr. 1981)). If the plaintiff does not plead facts giving rise to a strong inference of scienter, the PSLRA directs that the district court "shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).

Under Section 21E of the PSLRA, a defendant will not be liable for forward-looking statements, where the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(A)(ii) ("safe harbor").

**3. Plaintiffs failed to adequately plead scienter**

Plaintiffs argue that the complaint adequately pleads scienter, and that the district court applied the wrong standard to their complaint. They emphasize that "circumstantial evidence can support a strong inference of scienter," *Nathenson*, 267 F.3d at 410, and argue that the district court improperly assumed the role of fact finder in weighing the evidence, instead of construing the allegations in plaintiffs' favor.

First, plaintiffs point to the Wasserstein report as evidence that defendants had actual knowledge of the true prospects for Azurix's success— *i.e.*, that its cost of capital was too high and that the Buenos Aires concession was plagued with problems. Second, plaintiffs argue Azurix had motive to inflate its stock price because, as the complaint alleges, Azurix used stock to raise capital. Third, plaintiffs point out the failure of Azurix's core business—water privatization projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's true prospects for success. Fourth, plaintiffs re-assert that Azurix's executive compensation was tied to share price. Fifth, plaintiffs point to the executive resignations as supporting the inference that those executives were fleeing from their improprieties. According to plaintiffs, the district court's contrary inference—that "the struggling company no longer had faith in its executives," 198 F.Supp.2d at 891—was improper fact finding. Finally, plaintiffs argue that the district court failed to address its assertion that raising IPO funds was a motive to commit fraud.

Plaintiffs acknowledge that mere motive and opportunity do not meet the PSLRA's requirements, but contend that they have pleaded more. And, they assert that the district court erred in considering these factors in isolation, rather than considering the totality of the circumstances.

We agree with the district court that the plaintiffs' allegations are insufficient under the PSLRA's

18

rigorous pleading standards. Although plaintiffs complain the district court improperly weighed the facts, the PSLRA's pleading standards explicitly contemplate such weighing by requiring the district court to determine whether or not the facts support a "*strong* inference" of scienter. That is, the district court must engage in some weighing of the allegations to determine whether the inferences toward scienter are strong or weak. We agree with the district court that the inferences of scienter are weak.

It is well established that bare allegations of motive and opportunity will not suffice to demonstrate scienter because, to hold otherwise, "would effectively eliminate the state of mind requirement as to all corporate officers and defendants." *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *see also Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). To the extent that plaintiffs rely on the mere facts of motive and opportunity, those allegations are insufficient. We note additionally that there is no allegation that defendants sold their Azurix shares, calling into question the alleged motive to artificially inflate the stock price. *See Abrams*, 292 F.3d at 434-35. Moreover, the successive resignations of key officials, as the district court stated, is more likely probative only of the fact that the company was failing.

Plaintiffs rely on the Wasserstein report as specific evidence that defendants had actual knowledge of Azurix's gloomy prospects and undisclosed problems. The Wasserstein report is dated December 4, 2000—well after the alleged misrepresentations and omissions—and is plainly a *hindsight* assessment of Azurix's brief stint as a public company. Nevertheless, plaintiffs cling to the following sentence as evidence that management knew of the problems all along: "The Buenos Aires concession, the company's second largest asset, faced numerous problems *since the acquisition* including incomplete customer accounts, difficulties in account receivable collection, water quality

19

issues and disputes over tariffs." (emphasis added). Emphasizing that we should construe the complaint in their favor, plaintiffs would have us read the sentence to mean that management knew *when it acquired the concession* that it was inheriting these problems.[8]

Even if we were to accept such a reading, the allegations are not sufficiently particular. The report describes the problems with Azurix in generalized terms, and, more importantly, it fails to identify exactly who supplied the information or when they knew the information. *See id.* at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). These statements fall far short of "the 'who, what, when, where, and how' required under 9(b) and [the Court's] securities fraud jurisprudence under the PSLRA." *Tchuruk*, 291 F.3d at 350.

The plaintiffs' allegations that defendants did not have the financial wherewithal to succeed because of their cost of capital or debts to Enron are also hindsight. Importantly, plaintiffs do not allege that Azurix falsely represented its capital structure, or its debts to Enron, in the prospectus.[9]

---

[8]We doubt that the sentence even admits of such a strained reading. It is more naturally read to mean that the concession had a string of problems which began to arise early in Azurix's ownership. The sentence certainly does not imply that management knew of the problems from the start.

[9] Plaintiffs have apparently misread the prospectus. A company called Atlantic Water Trust beneficially owned all of Azurix's common stock previous to the IPO (Enron and a company called Marlin Water Trust each had 50% voting interest in Atlantic). Atlantic was to sell just over half of the total number shares offered in the IPO and the rest of the shares would be new shares sold by Azurix. After the IPO, Atlantic was to hold about two-thirds of Azurix stock, and the remaining third would be public. According to the prospectus, Atlantic would pay Enron $180 million from its IPO proceeds, and Azurix would pay Enron $72 million as a loan repayment.
Plaintiffs mistakenly subtract Atlantic's $180 million obligation from the proceeds of the new shares Azurix issued to conclude that there would only be "small portion of the proceeds" remaining for Azurix to pursue growth opportunities.

20

It is difficult to form a "strong inference" of scienter from the alleged undercapitalization of a company when plaintiffs appear to concede that the company accurately disclosed its capital structure and financial obligations in its prospectus.

**4. Plaintiffs failed to adequately plead that the challenged representations were material misrepresentations**

Plaintiffs argue that the district court erred in concluding that some of the challenged statements were immaterial. Plaintiffs emphasize this Court's holding in *Rubinstein* that "Rule 10b-5 applies to predictive statements." 20 F.3d at 166. In *Rubinstein*, the Court stated that "a predictive statement is one that contains at least three factual assertions that may be actionable:" (1) "the speaker genuinely believes the statement is accurate;" (2) "there is a reasonable basis for that belief;" and (3) "the speaker is aware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement." *Id*. Plaintiffs assert that the optimistic representations were "specific material assurances of strength, ability and future, the accuracy of which was subject to quantitative verification." Specifically, plaintiffs re-assert that, contrary to the optimistic statements in its prospectus, Azurix was unable to compete in the global water market, and did not engage in careful due diligence for its acquisitions. And, contrary to its optimistic press releases and statements to the press after the IPO, Azurix did not have the access to capital to compete in the global water market.

We note initially that plaintiffs have failed to address the district court's holding that all of the forward-looking representations are protected under the PSLRA's safe harbor provisions. A review of the record indicates that all of the challenged documents, except for the Dow Jones News Service article, contained cautionary language which specifically referred to the PSLRA safe harbor.

Even apart from the safe harbor (and plaintiffs' failure to adequately plead scienter), we agree

21

with the district court that none of the challenged representations in the prospectus are actionable. The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial. As the Fourth Circuit observed, because analysts "rely on facts in determining the price of a security," these statements "are certainly not specific enough to perpetrate a fraud on the market." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993). Azurix was under no duty to cast its business in a pejorative, rather than a positive, light. *See Abrams*, 292 F.3d at 433 ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance."); *see also Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994). As the district court concluded, a "company's expressions of confidence in its management or business are not actionable, especially where, as here, all historical information appears to be factually correct." 882 F.Supp.2d at 882 (citation omitted).

The statement in the prospectus, "We anticipate funding capital expenditures [for the Buenos Aires concession] through operating cash flows and long-term debt and equity at the concession level," is likewise immaterial. It is notably qualified with the word "anticipate," and it is accompanied by extensive cautionary language about the company's ability to secure financing. Included in the risk disclosures is the statement: "There can be no assurances that we will be successful in securing any financing arrangements."

As for the due diligence assurances, we agree with the district court that "a rational investor would not have relied on the due diligence statements contained in the prospectus . . . ." 198 F.Supp.2d at 883. The prospectus states that Azurix had not yet assumed operations of the

concession. Among its nine single-spaced pages of risk disclosures, Azurix further warned of the possibility that its water supply would become contaminated and that the company would have trouble collecting from customers.

Virtually all of the challenged post-IPO representations were also immaterial, again, even apart from the failure to adequately plead scienter. For example, the Dow Jones News Service article, in which a company spokesperson said, "Our fundamentals are strong," is obviously immaterial puffery. *See Raab*, 4 F.3d at 290 ("Analysts and arbitragers rely on facts in determining the value of a security, not mere expressions of optimism from a company spokesman."). The same applies to the November 4, 1999 press release's statement, "The pipeline of private transactions and announced public tenders that we are pursuing remains strong." We note additionally that the prospectus identified around 60 privatization projects Azurix was targeting. As the district court observed, plaintiffs did not allege that any of those projects were, at the time of the prospectus, not potentially viable acquisitions. 198 F.Supp.2d at 882. The February 7, 2000 press release contains more of the same generalized puffery. Importantly, plaintiffs have not alleged that any of the historical representations in that press release were false. Finally, the representation in its May 8, 2000 press release that Azurix was "making steady progress" is precisely the sort of generalized positive characterization that is not actionable under the securities laws.

### 5. *Rubinstein* is distinguishable

Although the plaintiffs rely heavily on this Court's holding in *Rubinstein* that predictive statements can be actionable, a comparison to *Rubinstein* (a pre-PSLRA case) underscores why these pleadings are not sufficient. In that case, a defendant oil company performed initial tests on a new natural gas well, and announced extremely favorable tests results: "Analysts commented that these test results

23

suggested that the well and the field in which it was located were extremely valuable, possibly one of the largest onshore discoveries of natural gas in recent years." 20 F.3d at 163. Officers of the company echoed the analysts' favorable predictions, and the company's stock reached a "record high." *Id*. Plaintiffs alleged that the test results provided no basis for these statements, and that the defendants had failed to disclose material information—certain measurements of a pressure decrease—which would cast serious doubt on the projections. *Id*. While the price was high, defendants allegedly exercised their stock options, and "then immediately sold most of their newly acquired shares on the open market." *Id*. at 164. Shortly thereafter, defendants issued a press release disclosing the pressure drop. *Id*. Within months, an analyst publicly disclosed more damaging information about the well and concluded its reserves were not even enough to cover the cost of the well. *Id*. at 165.

The *Rubinstein* court noted that "[s]imply alleging that predictive statements at issue here did not have a reasonable basis—that is, that were negligently made—would hardly suffice to state a claim under Rule 10b-5." *Id*. at 169. However, the *Rubinstein* plaintiffs supported the allegations with specific allegations of insider trading in suspicious amounts and at suspicious times. *Id*.

Unlike the present case, the plaintiffs in *Rubinstein* alleged that defendants issued the sort of verifiable statements that could, and did, inflate the price of the stock, and that the defendants engaged in specific activity (insider trading), from which it could be inferred they intentionally manipulated the market. Plaintiffs are correct that predictive statements can be actionable, but, as explained above, their pleadings fall short of the necessary allegations.

## C. The district court properly dismissed the claims under the Securities Act of 1933

### 1. Standard of Review

24

As stated above at section II.B.1, *supra*, we review *de novo* a 12(b)(6) dismissal. We must accept the facts alleged in the complaint as true and construe the allegations in the light most favorable to the plaintiff.

### 2. Plaintiffs lack standing to sue under § 12

Section 12 of the Securities Act states that "[a]ny person who . . . sells . . . shall be liable. . . to the person purchasing such security from him . . . ." 15 U.S.C. § 77*l*(a). The Supreme Court interpreted this language in *Pinter v. Dahl*, 486 U.S. 622 (1988), to mean that a § 12(a)(2) "seller" includes either the person who actually passes title to the buyer, or "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," *e.g.*, a broker. *Id*. at 647.[10] Liability does not extend to the gratuitous solicitor, *id.* at 655, or to "collateral participants." *Id*. at 650.

Plaintiffs appear to concede that none of the plaintiffs obtained title to the securities directly from defendants. However, plaintiffs argue that, with respect to the individual defendants, signing the registration statement suffices for solicitation. They assert a "complex entanglement" with Azurix and Enron, from which it could be inferred that the companies participated in a "concerted course of action to market Azurix." In any event, plaintiffs argue that the issue of whether or not defendants actively participated in the solicitation is best left for a later stage in the litigation. We disagree.

To count as "solicitation," the seller must, at a minimum, directly communicate with the buyer. *See Craftmatic Sec. Litigation v. Kraftsow,* 890 F.2d 628, 636 (3d Cir. 1989) ("The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer

---

[10]*Pinter* involved a claim under § 12(1) (now § 12(a)(1)), but that analysis applies identically to § 12(a)(2). *See Cyrak v. Lemon*, 919 F.2d 320, 324-25 (5th Cir. 1990).

25

liable as a § 12[(a)](2) seller.") (alteration added). As this Court observed in *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363 (5th Cir. 2001): "in a firm commitment underwriting, such as this one, the public cannot ordinarily hold the issuers liable under section 12, because the public does not purchase from the issuers. Rather, the public purchases from the underwriters, and suing the issuers is an attempt to 'recover against [the] seller's seller.'" *Id*. at 370 (quoting *Pinter*, 486 U.S. at 544 n.1) (alteration in original). The issuer may only be liable under § 12(a)(2) if the plaintiff alleges "that an issuer's role was not the usual one; that it went farther and became a vendor's agent." *Id*. at 370.[11]

The plaintiffs have failed to allege in their original complaint, their motion to amend, or on appeal that any of the defendants assumed the "unusual" role of becoming a "vendor's agent," *id*., or otherwise actively solicited the plaintiffs to purchase. The district court correctly concluded that plaintiffs lacked standing to sue these defendants.

**3. Plaintiffs have standing to sue under § 11**

Plaintiffs argue that, contrary to the district court's conclusion, they have standing as aftermarket purchasers to sue under § 11. Defendants counter with the Supreme Court's decision in *Gustafson v. Alloyd Corp.*, 513 U.S. 561 (1995), which held § 12 not applicable to private, secondary transactions. *Gustafson* arguably suggests that § 11 applies only to direct IPO purchasers, not aftermarket purchasers. We agree with plaintiffs that § 11 applies to aftermarket purchasers.

In *Gustafson*, the purchasers of a plastics company, Alloyd, Inc., sought rescission of the deal on

---

[11]A leading treatise observes, "it seems quite clear that § 12 contemplates only an action by a buyer against *his or her immediate seller*. That is to say, in the case of the typical firm commitment underwriting, the ultimate investor can recover only from the dealer who sold to him or her." LOUIS LOSS & JOEL SELIGMAN, FUNDAMENTALS OF SECURITIES REGULATION 1147 (4th ed. 2001) (emphasis in original) (footnotes omitted).

the theory that the contract of sale was a "prospectus" within the meaning of § 12(2) (now § 12(a)(2)) and that it contained materially misleading information. 513 U.S. at 564-66. The Supreme Court rejected the claim, holding that "the term prospectus refers to a document soliciting the public to acquire securities." *Id*. at 574. In other words, § 12's right of rescission does not to extend to private, secondary sales. Language from the opinion appears to have implications for the application of § 11:

> The primary innovation of the 1933 Act was the creation of federal duties—for the most part, registration and disclosure obligations—in connection with public offerings. We are reluctant to conclude that § 12(2) creates vast additional liabilities that are quite independent of the new substantive obligations the Act imposes. It is more reasonable to interpret the liability provisions of the 1933 Act as designed for the primary purpose of providing remedies for violations of the obligations it had created. Indeed, §§ 11 and 12(1)—the statutory neighbors of § 12(2)—afford remedies for violations of those obligations.

*Id*. at 572 (internal citations omitted). The Supreme Court quoted with approval the House Report of the Securities Act: "'The bill affects only new offerings of securities . . . . It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering.'" *Id*. at 590 (quoting H. R. Rep. No. 85, 73d Cong., 1st Sess., 5 (1933)). In light of the broad liability under § 12—a plaintiff can recover without showing fraud or reliance—the Supreme Court concluded, "It is not plausible to infer that Congress created this extensive liability for every casual communication between buyer and seller in the secondary market." *Id*. at 578.

Immediately after *Gustafson*, a number of district courts seized upon its reasoning to conclude that aftermarket purchasers also lacked standing to sue under § 11. *See, e.g., Gould v. Harris*, 929 F. Supp. 353, 358-59 (C.D. Cal. 1996); *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 575 (D.N.J. 1996); *Stack v. Lobo*, 903 F. Supp. 1361, 1375 (N.D. Cal. 1995). As *Gould* explained, §§ 11 and 12 share the same legislative history, and § 11 likewise imposes liability without a showing

27

of fraud or reliance. 929 F.Supp. at 358.

Nevertheless, all four courts of appeals to address the question have held that, even after *Gustafson*, aftermarket purchasers have standing to sue under § 11. *See Demaria v. Andersen*, 318 F.3d 170, 175-78 (2d Cir. 2003); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 974-78 (8th Cir. 2002); *Joseph v. Wiles*, 223 F.3d 1155, 1158-61 (10th Cir. 2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1079-82 (9th Cir. 1999); *see also Adair v. Bristol Tech. Sys.*, 179 F.R.D. 126, 129-33 (S.D.N.Y. 1998); LOSS & SELIGMAN, *supra*, at 1150 (stating that under § 11, "[s]uit may be brought by any person who has acquired a security registered under the 1933 Act, whether in the process of distribution or in the open market."(footnote omitted)). Their reasoning is persuasive.

First, the plain language of § 11 permits "any person acquiring such security" to sue, 15 U.S.C. § 77k(a), whereas the § 12(a)(2) seller is liable only "to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2). *See Demaria*, 318 F.3d at 177 ("[T]he phrase 'any person acquiring such security' is plain on its face."); *Lee*, 294 F.3d at 976 ("The phrase 'any person acquiring such security' is not only broad on its face but, more importantly, is broad when compared to the language of § 12(2), the provision at issue in the *Gustafson* decision."); *Joseph*, 223 F.3d at 1159 ("[T]he natural reading of 'any person acquiring such security' is simply that the buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement."); *Hertzberg*, 191 F.3d at 1080.

Second, two damages provisions of § 11 appear to contemplate aftermarket plaintiffs. Section 11(e) sets the baseline for measuring damages as "the amount paid for the security (not exceeding the price at which the security was offered to the public)," 15 U.S.C. § 77k(e), and § 11(g) states, "In no case shall the amount recoverable under this section exceed the price at which the security was

28

offered to the public." 15 U.S.C. § 77k(g). "This express limitation on the recoverable damages would be redundant if only those who had purchased in the offering (*i.e.,* at the initial offering price) could recover, because their potential damages would be limited in any event to the price they had paid in the offering." *Demaria,* 318 F.3d at 177; *see also Lee*, 294 F.3d at 977; *Joseph*, 223 F.3d at 1159; *Hertzberg*, 191 F.3d at 1080.

Third, the broad reading of § 11 is consistent with the Supreme Court's concern in *Gustafson* that the Securities Act remain anchored to its original purpose of regulating only public offerings. *See Demaria*, 318 F.3d at 177 ("[T]he focus of the [§ 11] claim remains on deceptions occurring during the public offering."). Whereas the *Gustafson* plaintiffs sought to invoke § 12 for a *private* offering, § 11 only applies to public registered offerings. Moreover, in contrast to § 12(a)(2), a § 11 plaintiff *is* required to prove reliance on the alleged misstatements or omissions in the registration statement if the issuer has made available an earnings statement covering one year after the issuance. 15 U.S.C. § 77k(a). Thus, the Supreme Court's concern about extensive liability far beyond the initial offering is not implicated. In fact, by giving would-be defendants more incentive for compliance, the broader interpretation of § 11, more so than the limited reading, better effectuates the statutory purpose of regulating public offerings. *See id*.

Finally, this interpretation comports with longstanding pre-*Gustafson* jurisprudence holding that anyone who can "trace" his shares to the challenged registration statement (*i.e.*, not merely the initial purchasers) may sue under § 11. *See, e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992); *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967); *Cf. Columbia Gen. Inv. Corp. v. SEC*, 265 F.2d 559, 562 (5th Cir. 1959) ("Persons other than those who purchase the new stock under the Registration statement may be affected in point of fact and may, under certain circumstances, have

29

remedies in point of law for misrepresentations in a Registration.").

The district court erred in concluding that plaintiffs did not have standing on the mere fact that they were aftermarket purchasers. And, because there was only *one* offering of Azurix stock, all the plaintiffs' stock is traceable to the challenged registration statement. *See Hertzberg*, 191 F.3d at 1080.

### 4. The plaintiffs' claims under § 11 fail because none of the challenged representations are material

We nevertheless affirm because, as explained in section II.B.4, none of the challenged representations in the prospectus and registration statement are material. Even though the district court did not explicitly consider the materiality issue with respect to § 11, its analysis would be identical. The district court's very thorough discussion of the registration statement, 198 F.Supp.2d at 880-84, concludes that "plaintiffs *could not* have relied on *any* of the [challenged] statements in the prospectus, in light of Azurix's risk warnings and because the statements were merely expressions of corporate optimism . . . ." *Id*. at 884 (emphasis added). As explained more fully above, we agree with that conclusion.

### III. CONCLUSION

In sum, we conclude that the district court did not abuse its discretion in denying plaintiffs leave to amend their complaint, after it had been dismissed with prejudice. The plaintiffs' Exchange Act claims must be dismissed because plaintiffs failed to adequately plead that defendants acted with scienter. The plaintiffs' Securities Act claims fail because plaintiffs lack standing under § 12 and because plaintiffs failed to allege any material misstatements covered under § 11. We therefore AFFIRM.